BUCK TERRY AND TED DAVIS, *alias* T. A. DAVIS, *alias* T. A. STEWART V. THE STATE.

No. 23498. Delivered November 27, 1946.

The opinion states the case.

*Percy Foreman,* of Houston, for appellants.

*A. C. Winborn,* District Attorney, and *R. H. Gallier,* and *E. T.* Branch, Assistant District Attorneys, all of Houston, and *Ernest S. Goens, State's* Attorney, of Austin, for the State.

KRUEGER, Judge.

The appellant, Buck Terry, C. B. Reynolds, Fred Mullins, and Ted Davis, alias T. A. Davis, alias T. A. Stewart, were jointly indicted for the offense of robbery by the use of firearms. On the 19th day of February, 1946, Buck Terry and Ted Davis, alias T. A. Davis, alias T. A. Stewart, were arraigned in due form of the law. Ted Davis, alias T. A. Davis, alias T. A. Stewart, entered a plea of guilty, and his punishment was assessed at confinement in the State penitentiary for a term of 50 years. Buck Terry plead not guilty, and upon his trial was found guilty, and his punishment was assessed at confinement in the State penitentiary for a term of 30 years. From said judgments, the defendants prosecute this appeal.

The first and chief contention is that the evidence is insufficient to sustain their conviction. With this we do not agree. The record reflects that on the night of the 23rd day of October, 1945, two men, armed with pistols, entered the filling station of O. D. Jacobs, known as the Two Point Service Station, located at the intersection of the Beaumont Highway and the Old Liberty Road in Harris County; that they then and there robbed

the owner of the service station of approximately $180.00; that after they had obtained the money they left, going to an automobile parked a short distance away, but before they drove away in the parked car, two deputy sheriffs drove up to the service station, who were immediately informed of what had happened and the car was pointed out to them as the one which the robbers had entered. The officers saw that the lights of the car were flashed on and off several times, and then drove off. The officers pursued the fleeing automobile, blew their siren, but the fleeing car picked up speed, and so did the officers. Soon a shot was fired from the fleeing car and then the officers began to shoot and continued to do so until some 23 shots had been fired, as a result of which shooting a rear tire on the right-hand side of the bandit car was punctured and deflated. This caused the fleeing car to slow down and finally stop. The officers saw one man leave the automobile. He tried to escape but was apprehended before he got more than 20 yards away. This man proved to be Fred Mullins. The other two men in the rear seat were also arrested at the time. One of them was Davis and the other was Reynolds, neither of whom was struck by any of the bullets. The officers, in looking over the car, noticed some blood on the left-hand front seat and on the steering wheel, which caused them to believe that the man who drove the fleeing car had been struck but had escaped without them noticing it. They made a further investigation and found a trail of blood beginning about eight feet from where the car came to a stop, down to the drainage ditch, then into the ditch, then to the right of the ditch, parallel to a fence and then to the end of the fence, where the trail disappeared. The distance from where they first saw the blood to where it disappeared was approximately 170 yards. The bandit car, according to the license number thereon, proved to belong to Buck Terry. On the front seat the officers found a .32 caliber Colt Automatic, and on the rear seat a .45 caliber Colt Automatic Pistol. The record further shows that about 4:30 or 5:00 A. M., Buck Terry appeared at the home of John Hancock. His trousers were torn and there was blood on his face. He told Hancock that they had hi-jacked a filling station; That Mullins, Davis and Reynolds were arrested or killed. He said that he was shot, but ran from the car in which they were fleeing. He asked Hancock to take him to Fort Worth. Terry changed his clothes while at Hancock's home. Then Terry, Hancock, and a man by the name of Dub, who was spending the night at the Hancock home, started in Hancock's automobile for Fort Worth. When they arrived at Huntsville, they stopped at a service station, where Terry called his wife at Fort Worth over the telephone. After they arrived at Fort Worth, he met his wife at a tourist

camp, where he was arrested at 12:45 A. M., October 25th, at which time he had blood on his face and ear, and there was also blood on the pillow where he slept.

Mrs. John Hancock, who was not an accomplice witness, testified at the instance of the State that about 4:30 or 5:00 o'clock in the morning, Buck Terry came back to their home and said that he had been shot. He had blood on him, his pants were torn, and he also had blood all over his face. He told Mrs. Hancock that he got his car "shot up" and wanted Mr. Hancock to carry him to Fort Worth, where he wanted to report to "the law" that his car was stolen; that he wanted to call his wife in Fort Worth. He said he did not know what had happened to Reynolds, Davis and Mullins, whether they were arrested or had been killed; that during the afternoon prior to the occasion of the alleged robbery she noticed that Terry had a small gun with a "bright shiny barrel" while Mullins had a larger gun.

J. M. Black, an operator of a service station at Huntsville, testified that about 7:00 o'clock in the morning three men drove up to his service station, and one of them asked for permission to use the telephone; that this request was granted and he walked into the station to use it. This man had a bloody spot on the right-hand side of his face. In the judgment of the witness, this man was Terry. The witness testified that the telephone number at the station was 9515.

The records of the telephone office at Huntsville were introduced in evidence and showed that a call was placed October 24, 1945, at 7:08 A. M. from Huntsville, Texas, telephone number 9515 (which was Black's service station) to Fort Worth, Texas, calling Mrs. Estera Lee Terry. The record further reflects that Terry did talk to her at Fort Worth at that time by telephone.

Now, let us analyze the facts and see if they are sufficient to connect Terry with the offense charged. We first have Terry, Davis, Mullins and Reynolds meeting at John Hancock's home about 5:00 P. M., October 23rd. While there, the four went to the bath room and had a conversation. No one except the parties engaged therein knew the subject of this conversation. At about 8:00 or 8:30 P. M., all four of the parties left in Terry's car, leaving the Packard car in which Reynolds had come at the home of Hancock. About 12:00 o'clock midnight, a car drove up near the filling station heretofore mentioned and parked. Soon thereafter two parties entered the service station, and by the use of firearms, robbed the owner and then departed, going toward

the parked car, at which time two deputy sheriffs drove up, and what transpired from there on is fully stated above. We think the evidence is ample to support the conviction. We recognize that Hancock became an accomplice witness by his act in assisting Terry in his endeavor to escape arrest, prosecution and punishment. However, there is ample evidence, other than that of Hancock, to connect appellants with the commission of the offense.

Bill of Exception No. 1, as qualified by the court, fails to reflect any error.

Bill No. 2 complains of the testimony given by A. C. Howerton, a city detective of the City of Fort Worth, to the effect that he arrested the appellant Terry at a tourist camp on the succeeding night and then discovered a fresh wound through his ear. To which appellant objected on the ground that the officer had no search warrant or warrant of arrest. There was no search made so far as the bill shows. Although the testimony given by the city detective, as set forth in the bill of exceptions, was not admissible, yet there was ample evidence from other sources of like character which was legally admissible. Therefore, the testimony complained of can hardly be deemed to have affected the rights of the appellant. We have always held that where testimony is admitted without objection which is of like character as that objected to, no reversible error is shown. See Wilson v. State, 145 S. W. (2d) 890; Shepherd v. State, 171 S. W. (2d) 120.

No error appearing in the record, the judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.